*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0052a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CITY OF MONROE EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,
                    *Plaintiff-Appellant,*

    *v.*

BRIDGESTONE CORPORATION;
BRIDGESTONE/FIRESTONE, INC.; YOICHIRO KAIZAKI;
MASATOSHI ONO,

                    *Defendants-Appellees.*

No. 03-5505

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 01-00017—Robert L. Echols, Chief District Judge.

Argued: June 9, 2004

Decided and Filed: February 4, 2005

Before: KEITH and CLAY, Circuit Judges; OBERDORFER, Senior District Judge.[*]

---

## COUNSEL

**ARGUED:** Pamela M. Parker, LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, San Diego, California, for Appellant. Thomas S. Kilbane, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, James E. Gauch, JONES DAY, Washington, D.C., Erik L. Kitchen, STEPTOE & JOHNSON, Washington, D.C., for Appellees. **ON BRIEF:** Pamela M. Parker, Michael J. Dowd, William S. Lerach, LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, San Diego, California, George E. Barrett, BARRETT, JOHNSTON & PARSLEY, Nashville, Tennessee, Edward M. Gergosian, BARRACK, RODOS & BACINE, San Diego, California, for Appellant. Thomas S. Kilbane, George M. Von Mehren, Paul B. Ockene, Frances F. Goins, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, James E. Gauch, Stephen J. Brogan, Jacqueline M. Holmes, JONES DAY, Washington, D.C., Antonia B. Ianniello, Brian M. Heberlig, STEPTOE & JOHNSON, Washington, D.C., for Appellees.

---

[*] The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

1

———————————

**AMENDED OPINION**

———————————

OBERDORFER, Senior District Judge.   In this appeal, we review the district court's dismissal with prejudice of a securities fraud class action Consolidated Complaint ("Complaint") filed by investors in Bridgestone Corporation ("Bridgestone") against Bridgestone, its subsidiary Bridgestone/Firestone, Inc. ("Firestone"), Bridgestone Chief Executive Officer ("CEO") Yoichiro Kaizaki, and Bridgestone Executive Vice President and Firestone CEO Masatoshi Ono. The district court dismissed the claims against Kaizaki for lack of personal jurisdiction and dismissed the claims against Bridgestone, Firestone and Ono for failure to state a claim upon which relief could be granted.   For the reasons stated below, we affirm in part, reverse in part, and remand.

## I.  BACKGROUND

We assume the truth of the following facts for the purpose of this appeal.  Unless otherwise indicated, they are drawn from the Complaint.

Bridgestone, a multi-national corporation with its international headquarters in Japan, is the world's largest tire manufacturer.  Bridgestone's stock trades in Japan on the Tokyo Stock Exchange.  Bridgestone's stock does not trade on any American stock exchange.  Accordingly, Bridgestone is not required to register its equity securities with the United States Securities & Exchange Commission ("SEC").  Bridgestone's stock trades in the United States on the over-the-counter, or "OTC," market.  The OTC market is an American market for foreign-issued securities not traded on any domestic stock exchange.[1]

Bridgestone operates in the United States through its regional corporate headquarters in Nashville, Tennessee, and through its wholly owned subsidiary Firestone.  Firestone's corporate headquarters are in Nashville.  Firestone's largest tire production facility is in Decatur, Illinois.

From 1993 to 2001, Yoichiro Kaizaki was Bridgestone's President and CEO.  In January 2001, he resigned from both positions.  Kaizaki is now retired and resides in Japan.  From 1993 to October 2000, Appellee Masatoshi Ono was the Executive Vice-President of Bridgestone and CEO of Firestone.  In October 2000, Ono resigned from both positions.

Lead Class Plaintiff City of Monroe Employees Retirement System ("the Retirement Fund") is, like all class members, a purchaser of Bridgestone common stock or American Depository

—————————————

[1] *See* the National Association of Securities Dealers, Inc. ("NASD") website, <http://www.nasd.com/resources/glossary>. *See generally New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice."), *cert. denied*, 540 U.S. 1183 (2004); Fed. R. Evid. 201 (providing that "[a] court may take judicial notice, whether requested or not" of a "judicially noticed fact" which "must be one not subject to reasonable dispute," a requirement satisfied if the fact is "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

Receipts[2] for Bridgestone common stock between March 31, 1998 to August 31, 2000. The allegations in the Retirement Fund's Complaint relate to events dating back to 1978.

In that year, Firestone's "Firestone 500" tire was the leading steel-belted radial tire brand. In 1978 and 1979 combined, Firestone manufactured approximately 14,000 defective Firestone 500 tires, resulting in hundreds of passenger vehicle crashes and 41 fatalities. Initially, Firestone publicly attributed the known failures to consumers' failure to properly inflate or take care of their tires. Government investigators subsequently determined that Firestone had added too much of an adhesion-boosting compound to the rubber that held the steel belts together, resulting in rubber tire tread separating from underlying steel belts, eventually leading to the tires suddenly falling apart. As a result, in 1979, Firestone paid a $500,000 fine imposed by the National Highway Traffic Safety Administration ("NHTSA"),[3] the then-largest-ever fine imposed by the NHTSA, and instituted a recall from consumers of 13 million Firestone 500 tires. The recall injured Firestone's corporate image, brand, and financial performance. App. at 143 (Complaint).

In 1988,[4] Bridgestone acquired Firestone for $2.6 billion. Upon acquiring Firestone, Bridgestone sought to increase Firestone's revenue by expanding its contractual relationship with Ford Motor Company ("Ford"), a leading American automobile manufacturer.

In 1988 and 1989, Ford was developing the Explorer, a new sport-utility vehicle. Firestone sought to obtain the tire supply contract for the Explorer. Towards that end, Firestone, in 1989, submitted prototypes of its ATX tires to Ford for testing.[5] An outside company tested seventeen of the prototypes. In February 1989, the outside testing company reported that five of the seventeen prototypes had failed due to tread separation problems under heavy loads and strenuous conditions.

In March 1990, Ford introduced the new Explorer, equipped with Firestone ATX tires. Between 1990 and 1993, Ford sold over 300,000 Explorers per year. By 1993, Ford had become Firestone's leading customer as measured by sales volume and Firestone's financial health had improved markedly. Firestone had been losing approximately $1 million per day as of 1989-1990, prior to entering into the contract with Ford to outfit the Explorer with ATX tires; by 1993, Firestone was profitable.

Beginning in 1992, Firestone began receiving consumer complaints regarding tire tread defects, some of which led to "rollover" accidents in which the Explorer would flip over on to its side. Between 1992 and 1996, consumers filed 16 or more lawsuits against Bridgestone or Firestone for rollover accidents allegedly caused by ATX tire failures on the Explorer. Between 1993 and 1994, such suits based on problems with ATX tires increased from 13% of the claims filed against Firestone from problems in light truck tires to 43% of that category of claims. By 1999, at least 50 such suits had been filed.

---

[2] An American Depository Receipt, or "ADR," represents ownership in a security issued by a foreign company in foreign markets. Typically, a United States depository bank has custody of the security corresponding to an ADR and issues the ADR certificate to a United States investor. *See generally* Edward F. Greene, et al., U.S. Regulation of the International Securities and Derivatives Markets, § 2.02 (2000); Fed. R. Evid. 201 (authorizing, and providing standards for, taking judicial notice). Each Bridgestone ADR represents ten shares of Bridgestone common stock. *See* Joint Appendix ("App.") at 140.

[3] The NHTSA is an adminstration within the United States Department of Transportation. *See generally* 49 U.S.C. § 105.

[4] The Complaint does not address the years 1980--1987.

[5] The Firestone ATX brands included the ATX, ATX II, and Wilderness AT Tires. App. at 144, 150, 154. Unless otherwise specified, we refer to these brands collectively as the "ATX" tires.

The Complaint alleges that by 1994, under pressure to cut its costs and increase the productivity and production rates of its American manufacturing facilities, Firestone imposed longer hourly work shifts to permit around-the-clock, seven days-a-week operations. In July 1994, Firestone's labor force, which was unionized, responded by engaging in a massive production strike.

During the strike, Firestone continued production at its Decatur, Illinois manufacturing plant. To do so, Firestone staffed the manufacturing floor with "untrained and inexperienced non-union replacement workers," along with management employees. App. at 146. During the strike, the number of defective tires increased sharply "as supervisors and under-trained or untrained replacement workers were called on to master highly skilled jobs to keep the Decatur plant running." *Id.* at 147.

In 1996, Firestone management, as part of the negotiations that ended the strike, extracted from the Firestone employees' union concessions under which production speed increased, including longer work shifts and retention of a seven-days-a-week production schedule. *Id.* at 147. In its 1996 Annual Report, Bridgestone proclaimed that "[w]e reached an agreement in 1996 with the union that represents employees at several of our North American plants . . . The union has accepted already-implemented adjustments in working hours that permit our plants to operate 24 hours a day, seven days a week." *Id.* at 246. After the strike, the increased level of production errors persisted in tires made at Firestone's Decatur plant. The Complaint alleges that production and inspection shortcuts resulted in a sharp rise in the number of tires that were not properly manufactured, tested, or inspected.

In 1996, Firestone performed random quality control high-speed durability tests on various ATX tires. In one of the sample tests, Firestone examined 129 ATX tires made at the Decatur plant. Eighteen of those tires failed the test due to tire tread separation. In another random test of 229 ATX tires from the Decatur plant, 31 failed. In an additional random test of 18 ATX tires, eight failed, seven of which were from the Decatur plant. Internal Firestone documents show that the tires' tread separation rate was highest for tires produced at the Decatur plant from 1994 to 1996, during and just after the strike.

In addition to the alleged several thousand claims submitted by consumers directly to Firestone for compensation, between 1997 and 1999, United States consumers filed 34 suits against Bridgestone or Firestone based on deaths or injuries allegedly caused by rollovers of Explorers equipped with Firestone ATX tires. By no later than 1997, senior Firestone officials, including Firestone CEO and Bridgestone Executive Vice-President Ono, were tracking the claims and lawsuits. Robert Martin, who was Firestone's Vice President of Quality Assurance from 1997 or earlier until his retirement in April 2000, testified in a deposition that senior Firestone executives, Ono included, met at least quarterly from 1997 through 1999. The meetings consisted of Firestone's senior management group, the financial group, the quality group, and the public relations / marketing department. Martin testified that those meetings included discussion of tread-peeling claims and lawsuits lodged against Firestone and Bridgestone.

Internal Firestone documents regarding property damage, injury claims, and tire performance data, such as warranty adjustments and financial analysis of such claims, show that starting in 1996, the ATX tires began to fail at higher rates than they had before. Similarly, a Firestone chart reveals that from 1998 to 1999, tread separations for the Wilderness AT, one of Firestone's ATX tire models, increased by 194%. According to a 1999 internal Firestone report, in 1997 and 1998, another Firestone tire model, the ATX II, accounted for the majority of the tire claims against Firestone but for less than 10% of Firestone's total tire production. The Complaint alleges that Firestone "had knowledge of thousands of claims for and complaints concerning ATX tire failures, especially ATX tires manufactured at [its] Decatur, Illinois plant during and after a bitter 1994-1996 strike, due to design and manufacturing defects which resulted in over 2,200 rollover accidents, over

700 serious injuries and approximately 174 fatalities by 2000." App. at 131 (Complaint). In response to the lawsuits, Firestone and Bridgestone entered into settlement agreements under which the settlement agreements with plaintiffs were sealed, the parties entered into stipulated protective orders to conceal discovery, and Bridgestone or Firestone had returned to it "damaging documents." *Id.* at 151.

In 1996 and 1997, State Farm Insurance Company, the largest automobile insurer in the United States, demanded that Firestone pay the costs of automobile accidents attributable to ATX tire failures. Without conceding (or contesting) liability, Firestone reimbursed State Farm without public disclosure of the claims or the resulting payments. Having been paid, State Farm did not sue Firestone, lawsuits which the Complaint alleges "would have publicized the growing problem with the ATX tires." *Id.* at 150.

Firestone suppressed information pertaining to investigations by various governments, domestic and foreign. In 1996, Arizona state government agencies expressed concern about the Firestone ATX tires. Firestone sent a team of engineers to investigate and then replaced certain Explorer tires without any public disclosure of the investigation or the replacements.

In Venezuela, between 1990 and 1998, over forty people were killed in Explorer accidents allegedly due to ATX tire failures. Ford demanded that Firestone alter the design of its ATX tire being sold in Venezuela to include a nylon layer. Firestone initially did not do so. The Venezuelan government investigated and expressed concerns to Firestone about the ATX tires. According to a Venezuelan government document, Firestone agreed to add a nylon layer to the tires in exchange for the Venezuelan government's promise that it would not publicly disclose this act by Firestone. According to the Venezuelan government document, Firestone expressed a belief that disclosure of the layer-adding "would put in jeopardy the Bridgestone brand in Venezuela." *Id.* at 152.

In Saudi Arabia, multiple people in Ford Explorers outfitted with Firestone ATX tires also died between 1990 and 1998 due, allegedly, to ATX tire failures. *Id.* at 152. Firestone's senior management team discussed the possibility of a formal recall of the ATX tires in the Persian Gulf region. Firestone ultimately decided not to initiate such a recall. *Id.* A March 1999 internal Ford memorandum stated, with respect to that decision, that "Firestone legal has some major reservations about the plan to notify customers and offer them an option . . . They feel that [the National Highway Traffic Safety Administration, or 'NHTSA'] will have to be notified of the program, since the product is sold in the U.S." *Id.* at 153.

Regarding the ATX-related accident data from the United States, Venezuela, and Saudi Arabia, the Complaint alleges that Bridgestone and Firestone executives "kept the accident rate data which they had and which showed these serious problems from safety regulators." *Id.* at 151. The Complaint alleges that their motive for doing so was "so they could report huge profits and their executives could retain their positions of power, prestige and profit and Bridgestone's stock and ADRs would continue to trade at inflated, higher prices, providing the executives with direct economic benefits based on their stock holdings and options and allowing them to personally pocket huge bonuses based on corporate profits." *Id.* at 151-52.

The Complaint alleges a series of public, fraudulent statements by Bridgestone and Firestone, beginning in March 1997 when Bridgestone issued its 1996 Annual Report.[6] (Bridgestone typically

---

[6]The Complaint relies heavily on Bridgestone's Annual Reports for fiscal years 1996--2000. Bridgestone attached to its motions to dismiss before the district court copies of those documents. *See* App. at 241-- 476. Accordingly, we, like the district court, consider the full text of the 1996--2000 Annual Reports. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) ("[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." (internal

issued its annual reports for each fiscal year in March or April of the subsequent year).  The 1996 Annual Report stated, in its introductory "Word from the President" section:

> We are staking our claim to global leadership on the tire industry. . . .  I am especially satisfied with our ongoing business turnaround in the Americas, the biggest tire market in the world
>
> \*  \*  \*  \*  \*  \*
>
> Our competitive edge in tire technology remains our highest asset. . . .  Technology will continue to strengthen the appeal of our products and operations.  This will include safety and improving performance.

App. at 245-47 (1996 Annual Report).

In March 1998 came Bridgestone's 1997 Annual Report.  The accompanying letter stated: "We are making steady progress towards leadership in the world tire industry . . . .  Sales at our subsidiary for the Americas, [Firestone], surpassed our parent-company turnover for the first time."  App. at 289 (1997 Annual Report).  Similarly, Bridgestone's 1998 Annual Report, issued in April 1999, stated:  "[t]he Americas, the largest tire market in the world, are our biggest source of consolidated sales . . . Our global market share in original equipment tires increased further in 1998.  That growth evidences high regard among automakers for our strengths in product quality."  App. at 342 (1998 Annual Report).

In early February 2000, a Houston, Texas television station reported that passengers in three Explorers equipped with ATX tires had died after suffering rollover accidents.  On February 4, 2000, Firestone issued a release stating: "We monitor the performance of all of our tires and . . . we have full confidence in them."  App. at 167 (Complaint).

In March 2000, Bridgestone issued its 1999 Annual Report.  It stated:  "We are determined to assert a singular advantage in product technology. . . .  We increased our market share in North America in 1999 in . . . the original equipment market.  Our North American operations are approaching a market share of 20%."  App. at 384 (1999 Annual Report).  The Report included in its "Analysis of Financial Position" section a chart indicating that as a percentage of Bridgestone's total international net sales, its net sales in the Americas were 41.5 %,[7] followed by Japan at 40.8 %, Europe 10.6% and "Others" 7.1%.  *See id.* at 403.  In the "Americas" section, under the bold, purple-colored, large font heading of "Trends And Topics," the Report stated that "[w]e increased our market share in North America in 1999 . . . Demand for original equipment tires continued to grow in 1999 in the booming North American automobile market."  *Id.* at 383-84.  The Annual Report also stated that "[o]ur multi-brand strategy--centered on the Bridgestone, Firestone, and Dayton[8] brands--raised our market profile further in 1999," and that "aggressive product development and strategic marketing have re-established the Firestone name as a vigorous brand in premium-grade tires, as well as a large-volume, middle-market tires."  *Id.* at 384.  It continued: "Ford Motor Company is our oldest customer in North America . . . We also have become a major supplier to General Motors Corporation, which recently honored us with its Supplier of the Year

---

quotations omitted)).

[7]Bridgestone's 1999 Annual Report did not break down the sales data between North and South America, nor as between dealers in individual countries in the Americas.

[8]Dayton was a Bridgestone brand marketed, in the words of the 1999 Annual Report, to consumers seeking "value-oriented tires."  App. at 384.

Award for the fifth consecutive year.  As a major supplier to leading European automakers, we have developed business with the North American operations of those automakers, too.  We also supply tires to nearly all the Japanese-owned vehicle plants in North America."  *Id.*

Each of the Annual Reports covering fiscal years 1996 to 1999 included financial statements with a category labeled "Contingent Liabilities."  *See* App. at 278, 322, 367, 417-18 (1996 – 1999 Annual Reports, respectively).  None of those reports, though, made a mention or disclosure of any loss contingency related to any of Bridgestone or Firestone's tire products that had previously been sold or sent to dealers.

Each of the Annual Reports from 1996 to 1998 included a letter from Bridgestone's outside auditors Asahi and Company stating that the given Annual Report was prepared "in conformity with accounting principles generally accepted in Japan applied on a consistent basis."  App. at 280, 324, 370 (1996--1998 Annual Reports, respectively).  The 1999 Annual Report contained similar language, stating that the consolidated financial statements accompanying it were prepared "in conformity with accounting principles and practices generally accepted in Japan . . . applied on a consistent basis, except for changes, with which we concur, in the method of accounting for retirement and severance benefits and pension costs . . . and for goodwill, consolidation differences, and income taxes."  App. at 422 (1999 Annual Report).  The Complaint alleges that under International Accounting Standard § 9010.08-.09, applicable in Japan pursuant to the International Accounting Standards Committee, "loss contingencies should be recorded if it is probable that an asset has been impaired or a liability incurred at the balance sheet date and a reasonable estimate of the amount of the resulting loss can be made."  App. at 178 (Complaint).  Section 9010.08-09 provides further that "if either of the conditions is met and the possibility of the loss is not remote, the existence of the contingent loss should be disclosed in the financial statements."  *Id.*  The Complaint alleges that under this standard, Bridgestone's lack of recordings of a loss contingency in the financial statements accompanying the Annual Reports for fiscal years 1996 through 1999 related to the safety and legal problems with the Firestone ATX tires--in particular a recall--were each separately an actionable misrepresentation in violation of federal securities laws.

Generally Accepted Accounting Principles, or "GAAP," are a series of general principles followed by accountants in a given country or geographic area. Bridgestone's 1999 Annual Report stated that "[t]he Japanese consolidated financial statements have been prepared in accordance with the provisions set forth in the . . . accounting principles and practices generally accepted in Japan ('Japanese GAAP')."  App. at 413 (1999 Annual Report).  It represented that the "accompanying financial statements include the accounts of certain foreign subsidiaries, which are based upon U.S. GAAP, representing 45% of total consolidated assets and 51% of total consolidated revenues in 1999."  *Id.*  Bridgestone and Firestone do not dispute that this statement was a reference to, among other non-Japanese Bridgestone subsidiaries, Firestone.  United States GAAP, as set forth in Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 5 ("FASB 5"), "requires that loss be accrued whenever it is probable a loss has been incurred or an asset impaired and the amount of the loss can be reasonably estimated" and that "[i]f the loss is at least reasonably possible but no reasonable estimate can be made, the contingency at a minimum should be disclosed."  App. at 178 (Complaint).  The 1999 Annual Report stated that Japanese GAAP "are different in certain material respects (*e.g.* topics addressed, available alternatives, recognition criteria, measurement practices, presentation formats and disclosures, etc.), as compared to accounting and reporting standards generally accepted in the U.S. ('U.S.GAAP')."  App. at 413 (1999 Annual Report).  At note 11, the Report included "a supplemental discussion of the accounting differences," *id.*, and listed a number of "differences between Japanese and U.S. GAAP," *id.* at 421.  Note 11 did not include a reference to FASB 5 as one of the differences between U.S. and Japanese GAAP.  *See id.*  The Complaint alleges that under FASB 5, Bridgestone's failure to either accrue for a loss or disclose both the ongoing losses from claims due to settlement and the

contingency of a recall or a major loss related to the impairment of the Firestone tires was an actionable misrepresentation.

In July 2000, after consumers filed two lawsuits against Firestone alleging that ATX tire tread separation caused Ford Explorers to roll over and cause fatalities, the Wall Street Journal asked Firestone to comment. A resulting July 26, 2000 Wall Street Journal article quoted a Firestone representative as stating that Firestone had "full confidence" in its tires. App. at 170-71 (Complaint). Also in July 2000, several safety groups urged Ford to recall all Explorers with Firestone ATX tires on them. On August 1, 2000, Firestone issued a written statement that "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires." *Id.* In that release, Firestone further stated that "[p]roperly inflated and maintained Firestone ATX . . . tires are among the safest tires on the road today." *Id.* On August 3, 2000, the New York Times published an article about the Explorer and Firestone's ATX tires, suggesting problems with the tires. The article reported that "Firestone denied the charges. . . . 'These are safe tires,' said . . . a [Firestone] spokeswoman." *Id.* at 171.[9] The Complaint alleges that these public statements by Firestone in July 2000 and August 2000 were misrepresentations in violation of federal securities laws.

On August 9, 2000, Firestone announced that effective that day, it was beginning a formal, voluntary safety recall. The recall included 6.5 million Firestone ATX tires on Explorers already sold and an offer to replace all Firestone ATX tires on unsold Explorers in dealers' inventory at that time. The recall specifically designated ATX tires made at Firestone's Decatur plant.

In the months immediately following the recall, Firestone and Bridgestone suffered major upheaval. In October 2000, Ono resigned as Executive Vice President of Bridgestone and Chief Executive of Firestone. In January 2001, Kaizaki resigned as Bridgestone's President and Chief Executive Officer. Saudi Arabia banned the importation of ATX tires. The two companies' images were subjected to an array of public condemnation by regulators,[10] congressional representatives from both major American political parties,[11] and industry analysts.[12]

---

[9]The New York Times article identified the name of the Firestone spokesperson. Because that person is not a defendant in this case, and because neither the quotation's accuracy nor the spokesperson's job description are disputed, we need not repeat it here.

[10]*See, e.g.*, Jennifer Hoyt, *Agency Seeks Broader Authority to Probe Vehicle Safety Breaches*, Houston Chronicle, Sept. 13, 2000, at 4, *available at* 2000 WL 24511175 ("NHTSA Administrator Sue Bailey said she thought the problem was with tires, but that the agency was still investigating the vehicle-tire interaction."); Nedra Pickler, *Hearings Scheduled on Tire Case*, Associated Press, Sept. 14, 2000, available at 2000 WL 26675534 ("The National Highway Traffic Safety Administration has said it is investigating 88 deaths and more than 250 injuries over the past decade involving Firestone tires. The Wall Street Journal reported Thursday that five more deaths have occurred since the recall of 6.5 million ATX, ATX-II and Wilderness AT tires was announced"); App. at 136 (quoting a statement made August 30, 2000 by Samuel Ruh Rios, President of Indecu, the Venezuelan safety agency, that Bridgestone and Ford had "met to plan ways out of a situation that was affecting their commercial interests, at the price of causing damage, destruction, and death. . . . Both companies hid information and this caused many accidents"); *id.* at 172 (quoting an August 31, 2000 Reuters Report as stating that "Venezuela's consumer protection agency recommended . . . that criminal charges be filed against Bridgestone Corp . . . over defects linked to at least 46 deaths in Venezuelan road accidents"). We take judicial notice of the fact that the media articles cited above were published, without reaching any conclusions about their truth. *See generally* Fed. R. Evid. 201.

[11]*See, e.g.*, Hoyt, *Agency Seeks Broader Authority*, 2000 WL 24511175 ("Sens. Dianne Feinstein . . . and Herb Kohl [ ] announced that they would introduce a bill to increase civil penalties for withholding information from NHTSA. Their bill also would set criminal penalties for companies that knowingly allow defective vehicles or parts to be distributed if death or injury results."); App. at 172-73 (Complaint, quoting statement by United States Representative Heather Wilson, in response to claims by senior Firestone executives of lack of knowledge of fatal defects of the ATX tires: "'That's rubbish . . . You knew a long time ago.'"); *id.* at 173 (quoting Representative Billy Tauzin as stating through his spokesman, after a congressional hearing on the rollover accidents: "'This latest information only confirms

Most significant was the apparent financial impact of the recall. Firestone experienced a net $510 million loss for the 2000 fiscal year and Bridgestone' total profits decreased from about $764 million in 1999 to about $153 million in 2000. Between August 8, the day before the recall, and September 21, 2000, Bridgestone's common stock share price on the Tokyo stock exchange dropped from over $2,200.00 to less than $1,400.00. Between those same dates, its ADR share price dropped from over $202.00 to less than $122.00. Bridgestone's earnings for fiscal year 2000 were its lowest in a decade. In the 2000 Annual Report, then-newly installed Bridgestone CEO Shigeo Watanabe stated that "[n]et earnings declined 80% in the past year . . . That decline is attributable mainly to a special charge in connection with the tire recall in the United States. We have recorded a charge at [Firestone] of $754 million [ ] for costs already incurred in replacing the recalled tires and for potential liabilities and other legal costs in connection with the problems that led to the tire recall. . . . Fallout from the recall will remain a marketing issue for us in North America and elsewhere in 2001." *Id.* at 432 (2000 Annual Report).[13]

In the wake of the recall, Firestone immediately launched a four-month internal investigation culminating in a report released publicly in December 2000. *See* App. at 174 (Complaint). The report found that two problems were central to the ATX tires' repeated failures. First was a problem with the tires'"shoulder pocket," an area from the sidewall to the tread designed to give traction in snow and off-road driving conditions. In many of the ATX tires, the shoulder pocket was made with an angle steeper than is proper such that the pocket cracked on the inside. Particularly in those tires produced at the Decatur plant, the cracking was prone to spread from the pocket to the point where two belts of rubber-coated steel fibers form the tires' core. *Id.* Second, noted the report, the materials used at the Decatur plant produced tires less likely to stay intact. To make a tire, the various layers are heated and squeezed together by fusion. The Decatur plant produced rubber pellets while the other plants used rubber sheets. In each case, the pellets or sheets were sprayed with lubricant to keep the rubber from sticking together in large globules. Lubricant makes tires stick together less. Because the pellets had a larger surface area than the sheets, the pellets in the Decatur plant were exposed to two or three times more lubricant than the sheets from other plants. After Firestone's internal report was issued, Firestone began shipping rubber sheets from other plants to the Decatur plant to avoid this problem. *Id.*

On May 11, 2001, the Retirement Fund (as lead named plaintiff for the Class) filed the instant Consolidated Class Action Complaint in the United States District Court for the Middle District of Tennessee alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5, codified at

---

our suspicion that [Bridgestone and Firestone] knew a hell of a lot more than they're willing to admit.'").

[12]*See*, *e.g.*, App. at 9 (Complaint) (quoting David Meyers, Associate Professor of Management at Akron University, as stating "'I'm on record as saying that the Firestone brand name is toast. . . . That company's in trouble, and that's not news. I attended the congressional hearings at which company executives testified, and those people aren't believable. I wouldn't trust them with my kids['] piggy bank'") (internal parentheses omitted); *id.* (quoting Columbia University Law School Dean and Professor David Leebron as stating, on January 21, 2001: "'This is Firestone's Pinto.'").

[13]The recall's public policy impact has been evident as well. The public controversy surrounding the safety issues that led to the recall has in important ways influenced the policy debate in the four years since the recall. *See*, *e.g.*, Danny Hakim, *U.S. Regulators Release Vehicle Rollover Data*, N.Y. Times, Aug. 10, 2004, at C1, available at 2004 WLNR 5561590 ("The government rollover tests began this year at the direction of Congress, which ordered the agency to develop a track test in the wake of a series of fatal rollover crashes in the late 1990's involving Ford Explorers equipped with Firestone tires.").

17 C.F.R. § 240.[14] *See* App. at 130-186. The four defendants-- Bridgestone, Firestone, Kaizaki, and Ono--moved to dismiss the Complaint on a variety of grounds. *See* App. at 191-526.

On September 30, 2002, the district court issued a lengthy memorandum opinion and accompanying order dismissing the Complaint. *See* App. at 975-1038. Two of the district court's rulings are relevant in this appeal, each of which we describe in further detail within our analysis in Part II. First, the district court granted Kaizaki's motion to dismiss for lack of jurisdiction. Second, the district court granted--as to the remaining three defendants, Bridgestone, Firestone, and Ono--their motions to dismiss with prejudice all counts for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

The Retirement Fund appeals.

## II. DISCUSSION

On appeal, our analysis proceeds in three parts. Part II(A) articulates the applicable standards of review. Part II(B) assesses whether the district court erred in granting Kaizaki's motion to dismiss for lack of personal jurisdiction and concludes that it did not. Part II(C) addresses the merits and divides into two sections. Part II(C)(1) discusses whether the Complaint adequately pleaded any actionable statements and concludes, contrary to the district court, that one statement by Firestone and two statements by Bridgestone were actionable but, like the district court, that the remaining alleged statements in the Complaint were not actionable. Part II(C)(2) analyzes whether, for those three actionable statements, the Complaint adequately pled scienter as against Bridgestone, Firestone and Ono. It concludes that the Complaint did so for at least one statement with respect to each of the two corporate defendants, but did not do so with respect to Ono.

## A.    Standards of Review

We review de novo the district court's dismissal of the counts against Kaizaki for lack of personal jurisdiction. *See Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 793 (6th Cir. 1996). We also review de novo the district court's dismissal of the securities fraud complaint against Bridgestone, Firestone, and Ono for failure to state a claim upon which relief can be granted. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680 (6th Cir. 2004). In performing that review, we, like the district court, "must accept as true 'well-pleaded facts' set forth in the complaint." *Id.* (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). The Retirement Fund "need only give a 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 12(b)(6) allows a dismissal for failure to state a claim only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Id.* "What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations." *Lawler*, 898 F.2d at 1199 (quoting *Neitzke v. Williams*, 490 U.S. 319, 328 (1989)). Construing the Complaint in a light most favorable to the Retirement Fund, we must determine whether it "undoubtedly can prove no set of facts in support of [its] claims that would entitle [it] to relief." *PR Diamonds*, 364 F.3d at 680. That said, we do not accept as true "the bare assertion of legal conclusions," *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (internal quotation omitted), nor do we "accept as true legal conclusions or unwarranted factual inferences," *id.* (quoting *Morgan*, 829 F.2d at 12). Further, we may affirm

---

[14]On January 4, 2001, the Retirement Fund filed a class action against the now defendant-appellees in the United States District Court for the Middle District of Tennessee, alleging securities fraud. On January 22, 2001, plaintiff Patricia Ziemer filed a similar Complaint in that same court against the same defendants. On April 11, 2001, the district court consolidated the two actions into the instant case.

the district court on any ground supported by the record. *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 547-48 (6th Cir. 1999).

## B.       Personal Jurisdiction

The Due Process Clause of the United States Constitution "permits the exercise of both general and specific jurisdiction." *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators, Ltd.*, 138 F.3d 624, 627 (6th Cir. 1998). "General jurisdiction exists when a defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims." *Id.* (internal quotation omitted). Kaizaki lives today in Japan and at all relevant times lived and worked in Japan. The Retirement Fund does not argue that the district court could assert general jurisdiction over him. Rather, it argues that the district court should have exercised specific jurisdiction over him, which, in contrast, "subjects the defendant to 'suit in the forum state only on claims that arise out of or relate to a defendant's contacts with the forum.'" *Id.* at 627-28 (quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 & n. 8 (1984) (internal quotations in original omitted)).

Whether specific jurisdiction exists over Kaizaki depends on three criteria. *Id.* at 628. First, he must have purposefully availed himself of the privilege of acting in the United States or have purposefully caused a consequence in the United States. *Id.* Second, the cause of action must arise from his actions in the United States. *Id.* Finally, the exercise of jurisdiction by a court within the United States[15] over Kaizaki must be reasonable under the circumstances of this case. *Id.* The district court held that the Retirement Fund's Complaint failed all three prongs. *See* App. at 997-1002. We must affirm the district court's holding if we conclude that any one of the three prongs are not satisfied. *See*, *e.g.*, *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1303 (6th Cir. 1989) ("[E]ach criterion represents an independent requirement, and failure to meet *any* of the three means that personal jurisdiction *may not* be invoked.") (emphasis added).

Upon review, we conclude, under the circumstances of this case, that the third, "reasonableness" prong tips against exercising jurisdiction against Kaizaki. Whether the exercise of jurisdiction over a foreign defendant is reasonable is a function of balancing three factors: "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi Metal Indus. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 (1987).

Applying that balancing test to this case, there is clearly potential, should this suit go forward, for some substantial burden on Kaizaki. The Supreme Court has cautioned that "*[g]reat care and reserve* should be exercised when extending our notions of personal jurisdiction into the international field,'" *id.* at 115 (internal quotations omitted) (emphasis added), and that "the unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders," *id.* at 114. In performing this balancing of interests, we keep an eye towards "the interstate judicial system's interest" in judicial economy and "the shared interest of the several States in furthering fundamental substantive social policies." *Id.* at 113. In *Aristech*, decided in 1998, this Court upheld the reasonableness of exercising jurisdiction over a Canadian executive by reasoning, in part, that "a Canadian defendant . . . bears a substantially lighter burden than does a *Japanese* defendant – or for that matter, most other foreign defendants," since "only a short plane flight separates Ontario from Kentucky." 138 F.3d at 628 (emphasis added). "This is not a case," the

---

[15] The Securities Exchange Act includes a nationwide service-of-process provision. *See* 15 U.S.C. § 78aa. Therefore, the "forum" for the purposes of personal jurisdiction analysis in the Kazaiki's context is the United States, rather than any particular federal judicial district within the United States. *See United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993) (holding that 15 U.S.C. § 78aa "confers personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States").

court in *Aristech*, "where the exercise of jurisdiction requires a company to travel from the other side of the world or even across the Atlantic [ocean]." *Id.* (internal citations omitted). In contrast, of course, Kaizaki is living in Japan, and is a retired senior citizen at that. Though, presumably, a deposition or other proceedings involving Kaizaki's participation could be conducted by telephone or by counsel in Japan, circumstances might necessitate his traveling to the United States for a trial or other litigation-related purpose.

Turning to the other side of the scale, the countervailing interests of the United States as the forum and the class plaintiffs in the instant suit being prosecuted against Kaizaki are relatively light. The key defendants, we think, are Bridgestone and Firestone, the two corporate entities with substantial ongoing business affairs in the United States. The court's personal jurisdiction over the corporate defendants, and indeed over defendant Ono, is conceded.[16] Thus, the marginal addition of Kaizaki would add little or nothing to the potential recovery should the plaintiffs ultimately prevail on the merits and be awarded damages, for which Kaizaki would be at most "liable jointly and severally," but not separately liable. 15 U.S.C. § 78t(a). We thus agree with the district court's conclusion that "[b]ecause Bridgestone, Firestone and Ono are subject to jurisdiction, no actual violation of securities laws would go unpunished, and any [recovery] is highly unlikely to be affected by Kaizaki's dismissal." App. at 1001. Though the United States and the class plaintiffs of course have an interest in the enforcement of federal securities laws, those interests as against Kaizaki are tempered in the circumstances of this case. We find no error in the district court's conclusion that exercise of jurisdiction over Kaizaki in the circumstances of this case was not reasonable. Thus, even assuming, without deciding, that the first two prongs of the three-part specific jurisdiction test are satisfied, the district court did not err in granting Kaizaki's motion to dismiss for want of personal jurisdiction on the grounds that the third "reasonableness" prong was not satisfied.

The Retirement Fund suggests that even if we conclude that the circumstances of this case do not satisfy the test for personal jurisdiction over foreign defendants, its "allegations of control person liability" nonetheless "provide personal jurisdiction over Kaizaki." Appellant's Br. at 53. The notion of a control person derives from § 20(a) of the Securities Exchange Act, which attaches liability to "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). The term "control" in this context is defined by the code of federal regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

There is a division of judicial authority as to whether showing that a defendant is a controlling person within the meaning of these provisions (and thereby potentially liable under the securities law to the same extent as the controlled entity) is automatically sufficient to bring that defendant within the personal jurisdiction of the court merely because the controlled entity itself has the requisite jurisdictional contacts. *See*, *e.g.*, *In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 128-29 (D.D.C.2003) (collecting cases). This court has not apparently addressed the issue.

The Retirement Fund's theory is supported most prominently by *San Mateo County Transit Dist. v. Dearman, Fitzgerald, & Roberts, Inc.*, 979 F.2d 1356 (9th Cir. 1992). That decision held that jurisdiction is appropriate if the plaintiff makes only "a non-frivolous allegation that the defendant controlled a person liable for the fraud." *Id.* at 1358; *see also McNamara v. Bre-X*

---

[16]Bridgestone did not cross-appeal the denial of its motion to dismiss for lack of personal jurisdiction. Neither Ono or Firestone have contested personal jurisdiction.

*Minerals Ltd.*, 46 F. Supp. 2d 628, 636-37 (E. D. Tex. 1999) (adopting a rule that "the Court has personal jurisdiction over any Defendant as to which the Plaintiffs make a *prima facie* showing of control person liability."). Kaizaki responds that "[a] claim of statutory liability . . . is no substitute for establishing personal jurisdiction." Appellees Bridgestone and Kaizaki's Br. at 46 n.18 & accompanying text. We agree. "[L]iability is not to be conflated with amenability to suit in a particular forum. Personal jurisdiction has constitutional dimensions, and regardless of policy goals, Congress cannot override the due process clause, the source of protection for non-resident defendants." *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 590-591 (9th Cir. 1996) (internal citations omitted). The broad understanding of control person liability adopted by the securities laws cannot on its own support personal jurisdiction. This approach would, as one persuasive opinion stated, "impermissibly conflate[ ] statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair." *In re Baan*, 245 F. Supp. 2d at 129 (Huvelle, J.). Though they may involve a similar contact-based analysis, ultimately, the two inquiries must be distinct: "control person liability under the securities laws is not germane to the issue of personal jurisdiction . . . ." *FDIC v. Milken*, 781 F. Supp. 226, 234 (S.D.N.Y. 1991) (Pollak, J.).

We thus reject the Retirement Fund's invitation to substitute our analysis of the securities laws' substantive bases for liability for the required, due-process based personal jurisdiction analysis, and therefore decline to address Kaizaki's potential liability as a control person. For the foregoing reasons, we hold that the district court did not err in granting Kaizaki's motion to dismiss for want of personal jurisdiction. We turn then to the merits of the Complaint and analyze whether the district court erred in granting the motion to dismiss as against the other three defendants on the grounds that it failed to state a claim upon which relief could be granted.

## C.   Merits

Since their enactment in response to the stock market crash of 1929, the "basic policies underlying securities regulation" have been that "'[t]here cannot be honest markets without honest publicity'" because "'[m]anipulation and dishonest practices of the market place thrive upon mystery and secrecy.'" *Helwig*, 251 F.3d at 556 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) (quoting H.R. Rep. No. 1383, at 11 (1934))). The Supreme Court "'repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure,'" *Helwig*, 251 F.3d at 556 (quoting *Basic*, 485 U.S. at 230)), "to substitute a philosophy of full disclosure for the philosophy of caveat emptor," *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963)). Generally, federal securities law prohibits "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *Morse v. McWhorter*, 290 F.3d 795, 798 (6th Cir. 2002). Specifically, in order to state a claim under Section 10(b) of the Securities Exchange Act of 1934, or under SEC Rule 10b-5, a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (en banc) (citing *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir. 1991)); *see also Sofamor Danek*, 123 F.3d at 400.[17] A statement is said to be "actionable" when it satisfies the first two of these requirements, i.e., it is a misrepresentation or omission of a material fact that the defendant had a duty to disclose. *See, e.g.*, *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 415 (5th Cir. 2001); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001).

---

[17]The Complaint also alleges liability against Kaizaki and Ono under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), which provides for liability of controlling persons. As discussed above, we need not analyze the merits of the § 20(a) claim against Kaizaki because we resolve those claims on the jurisdictional issue. And, as discussed below, we need not resolve the "merits" of the control person liability theory against Ono beyond our conclusion that the Complaint does not adequately plead scienter against him.

The district court held that the Retirement Fund's Complaint failed to plead adequately any actionable statements for any allegedly fraudulent statements. It held, in the alternative, that the Retirement Fund failed to plead scienter adequately. The district court did not address the remaining two elements of the claim: reliance and proximate cause. As detailed in the discussion that follows, the district court's merits holdings were in part erroneous.

### 1.          Actionable Statements

In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant had a duty to disclose, two significant limitations to the general policy of disclosure. *See*, *e.g.*, *Basic*, 485 U.S. at 238 ("[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.") (emphasis in original omitted); *In Re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("[T]here is no general duty on the part of a company to provide the public with all material information."). As this Court has recognized, this set of requirements preserves the healthy limits on a public corporation's "duty to disclose all information[,] even colorably material," because corporations might otherwise "face potential second-guessing in a subsequent disclosure suit," a regime that would threaten to "deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public." *Sofamor Danek*, 123 F.3d at 403 (internal quotations and citations omitted). A duty to affirmatively disclose "may arise when there is insider trading, a statute requiring disclosure," or, as relevant to this case, "an inaccurate, incomplete or misleading prior disclosure." *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n.10 (3d Cir. 2004) (internal quotations omitted).

As for materiality, whether or not a statement is material turns on "a fact-intensive test." *Helwig*, 251 F.3d at 555.[18] "'Materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.'" *Id.* (quoting *Basic*, 485 U.S. at 240). That is, would the information, had it been presented accurately, have "'significantly altered the 'total mix' of information made available?'" *Id.* at 563 (quoting *Basic*, 485 U.S. at 231-32).

In this vein, this Court has distinguished between "hard" and "soft" information." *Sofamor Danek*, 123 F.3d at 401-02. "Hard information is typically historical information or other factual information that is objectively verifiable." *Id.* at 401 (internal quotations omitted). Publicly disclosed, hard information is actionable if false and material.

"Soft information," on the other hand, includes "predictions and matter of opinions." *Id.* at 402. The failure to disclose soft information is actionable "'only if [it is] . . . virtually as certain as hard facts.'" *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985)). Thus, federal courts "everywhere 'have demonstrated a willingness to find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace--loosely optimistic statements that are so vague, [and] so lacking in specificity, . . . that no reasonable investor could find them important to the total mix of information available.'" *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)).

However, opinions may be deemed false or misleading under the securities laws if proof of their falsity can be established "through the orthodox evidentiary process." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 1091-93 (1991). For such statements, "'a company is

---

[18]*Cf.* R. Gregory Roussel, *Securities Fraud or Mere Puffery: Refinement of the Corporate Puffery Defense*, 51 Vand. L. Rev. 1049, 1064-66 (1998) (discussing the virtues of the "contextual standard," as distinguished from rigid, bright-line rules, in assessing whether a statement should be classified as puffery).

generally under no obligation to disclose its expectations for the future to the investing public.'" *Helwig*, 251 F.3d at 564 (quoting, with approval, *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1277 (D. C. Cir. 1994)). If a company "chooses to volunteer such information," though, "its disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts . . . to the extent that the volunteered disclosure was misleading . . . ." *Id.* (internal quotations omitted). Our securities laws therefore "require an actor to 'provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'" *Helwig*, 251 F.3d at 561 (quoting *Rubin v. Schottenstein*, 143 F.3d 263, 268 (6th Cir. 1998) (en banc)).

> The question thus is not whether a [defendant's] silence can give rise to liability, but whether liability may flow from his decision to speak . . . concerning material details . . . , without revealing certain additional known facts necessary to make his statements not misleading. This question is answered by the text of [SEC] Rule 10b-5(b) itself: it is unlawful for any person to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."

*Rubin*, 143 F.3d at 267 (quoting 17 C.F.R. § 240.10b-5(b)).

With these standards in mind, we consider whether the plaintiffs have alleged any actionable statements. The alleged statements fall into two categories: (1) public statements by Bridgestone and Firestone affirming the safety or quality of Firestone's tires; and (2) allegedly false representations made by Bridgestone in the financial statements accompanying its Annual Reports.

### a.     Statements about the Quality or Safety of Firestone's ATX Tires

The Retirement Fund argues that a number of public statements by Bridgestone and Firestone about the quality or safety of Firestone's ATX times (summarized in Part I) are actionable because they were made "while in possession of specific, adverse information undermining the truth of those statements," Appellant's Br. at 40, thereby engendering a duty to disclose known adverse information about the safety of Firestone's tires. These statements include: (1) Bridgestone's 1996 Annual Report statement that it sold "the best tires in the world," its publicly distributed written statement in "late 1996" that it had "no reason to believe there is anything wrong with [its ATX tires]"; (2) Bridgestone's 1997 Annual Report statement that its products demonstrated "global consistent quality"; (3) Bridgestone's 1997 Annual Report statement that "[r]igorous testing under diverse conditions at our proving grounds around the world helps ensure reliable quality for original equipment customers"; (4) Bridgestone's 1998 Annual Report statement that sales success in North American was due to "high regard among automakers for our strengths in product quality;" (5) Bridgestone's 1999 Annual Report statement that "[w]e have built a premium-quality for . . . Firestone tires" and that "aggressive product development" had "re-established the Firestone name as a vigorous brand in premium-grade tires;" (6) Firestone's statements in February 2000 that it had "full confidence" in the ATX tires and that "[o]ur experience with Radial ATX indicates high consumer satisfaction with the quality and reliability of these tires"; (7) Firestone's statement in July 2000 that it had "full confidence" in its tires; and (8) Firestone's statement on August 1, 2000 that "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires" and that "[t]hese are safe tires."

As to Bridgestone's statements, the district court concluded that they were "statements of self-praise and confidence in its future," which "constituted immaterial opinions." App. at 1019. Similarly, as to Firestone's statements, the district court held that they were "of general optimism and in defense of its products . . . [and] immaterial as a matter of law." *Id.* at 1029. Accordingly, the district court held that all of these statements were non-actionable.

On appeal, Bridgestone and Firestone likewise argue that these statements were immaterial puffery. With one important exception – the statement in Firestone's August 1, 2000 concerning "objective data" – we agree that the statements recited above are best characterized as loosely optimistic statements insufficiently specific for a reasonable investor to "find them important to the total mix of information available." *In re Ford*, 381 F.3d at 570-71 (quoting *Shaw*, 82 F.3d at 1217)). These statements, both on their own terms and in context, lacked a standard against which a reasonable investor could expect them to be pegged; such statements describing a product in terms of "quality" or "best" or benefitting from "aggressive marketing" are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision. The statements are analogous to those deemed immaterial by a broad spectrum of federal courts. *See*, *e.g.*, *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 & n.2 (4th Cir. 1999) (concluding that the statements that "Food Lion is one of the best-managed high growth operators in the food retailing industry" and that it provided its employees with "some of the best benefits in the supermarket industry" were "immaterial puffery"); *Grossman v. Novell, Inc.*,120 F.3d 1112, 1121 (10th Cir. 1997) (holding that a company's statement that it had achieved "substantial success" in integrating the sales force of two merged companies was "an immaterial statement[] of corporate optimism"); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (holding that a company's statements that it was "optimistic" about its earnings and "should deliver income growth consistent with its historically superior performance" was non-actionable "puffery"); *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 229 & 232 (D.N.J. 2002) (holding that the statement that "[w]e are well prepared for the holiday season and believe it will clearly differentiate us as the leader in our segment of online retail" was not material); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 220 (D. Mass. 1999) (holding that the statement that company's product was enjoying "unprecedented market demand" was non-actionable puffery). We conclude that the district court did not err in dismissing the claims based on these statements.

**Firestone's August 1, 2000 Press Release: "Objective Data" Statement**. We reach a different conclusion, however, with respect to the statement in Firestone's August 1, 2000 press release. In that press release, Firestone stated: "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires." The context of statements is often telling. *See*, *e.g.*, *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery")). So it is with Firestone's August 1, 2000 statement. In July 2000, consumers filed multiple lawsuits against Firestone alleging that ATX tire tread separation caused Ford Explorers to roll over and caused fatalities. That same month, several safety groups urged Ford to recall the Explorers with Firestone ATX tires on them. On August 1, 2000, Firestone issued the statement concerning the "objective data." A reasonable juror could infer that the "objective data" representation was a direct response to the lawsuits, or to the public challenges to the safety of Firestone's tires, or to both.

A reasonable juror could also conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation. In 1996, Firestone had performed random quality control high-speed durability tests on ATX tires. In one of the sample tests, Firestone examined 129 ATX tires made at the Decatur plant. Eighteen of those tires failed the test due to tire tread separation. In another random test of 229 ATX tires from Decatur, thirty-one failed. In an additional random test of 18 ATX tires, eight failed, seven of which were from the Decatur plant. Internal Firestone documents show that Firestone knew since 1996-1997 from property damage and injury claims and tire performance data,

such as warranty adjustments and financial analysis of such claims, that its ATX tires were failing at unprecedented rates. Similarly, a Firestone chart reveals that from 1998 to 1999, tread separations for the Wilderness ATX tires--one of the ATX models--increased by 194%. According to a 1999 internal Firestone report, in 1997 and 1998, another of the ATX models-- the ATX II tires--accounted for the majority of Firestone's claims but less than 10% of its total production. Further, in Venezuela, between 1990 and 1998, over forty people were killed in Explorer accidents due to ATX tire failures and Ford had demanded that Firestone alter the design of its ATX tire being sold in Venezuela to include a nylon layer.

Firestone does not point to any record evidence showing its statement regarding the "objective data" was supported with respect to the ATX tires. It may be the case that at the summary judgment or trial stages of this dispute, Firestone will identify evidence that persuades the finder of fact that, as of the date of its statement on August 1, 2000 that "[p]roperly inflated and maintained Firestone ATX . . . tires are among the safest tires on the road today," *id.* at 171, the available objective data supported that claim. Or perhaps Firestone will introduce some other evidence showing that its statement about the objective data was in fact not misleading or false. However, at this stage in the lawsuit, construing the Complaint in a light most favorable to the Retirement Fund, *see PR Diamonds*, 364 F.3d at 680, we conclude that Firestone's representation concerning "objective data" could be deemed a material misrepresentation by a reasonable fact-finder. *See, e.g., Hanon v. Dataproducts Corp.*, 976 F.2d 497, 502 (9th Cir. 1992) (holding that the defendants' statements emphasizing superior quality were material because "a reasonable jury could conclude that [the company] publicly released optimistic statements . . . when it knew [its product] could not be built reliably"); *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1477-78 (N. D. Ga.1997) (statement that airline's safety record was "certifiably among the very best in the airline industry" was material and actionable); *In re F & M Distribs. Inc. Sec. Litig.*, 937 F. Supp. 647, 653 (E. D. Mich.1996) (holding that the defendant chain store's failure to disclose an adverse industry trend that made the "deal buying" strategy touted in its prospectus less viable than otherwise known could be actionable); *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 967 (D. Md. 1995) (holding that a drug company's statements that "[t]he results of treatment with [its product] were highly statistically significant along all of the efficacy parameters," and "[t]he data are overwhelmingly good" were material and actionable); *Cohen v. Prudential-Bache Sec., Inc.*, 713 F. Supp. 653, 658 (S.D.N.Y. 1989) (holding that a broker's statement to a client that she "would receive a very strong cash flow without risk to her initial investment" could not be dismissed as immaterial puffery).

In holding that Firestone's August 1, 2000 statement was actionable, we express no opinion as to whether Firestone necessarily had an obligation to disclose the various safety and looming regulatory issues surrounding the ATX tires regardless of whether it affirmatively spoke on the subject. The Retirement Fund does not rely on that allegation and, indeed, has waived such an argument. *See* App. at 558 (the Retirement Fund stating in a brief to the district court that "[p]laintiffs do not contend that in the face of defendants' silence they should have disclosed the defects in the ATX tires."). We merely hold that once Firestone elected to make statements such as the statement regarding the "objective data," it was required to qualify that representation with known information undermining (or seemingly undermining) the claim. *See Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) ("[C]orporate officers are not required to speak, but once they do, they must be truthful if their comments are material to investors' decisionmaking."); *In re K-tel Intern, Inc. Sec. Litig.*, 300 F.3d 881, 896, 898 (8th Cir. 2002) ("[T]he requirement is not to dump all known information with every public announcement, but the law requires 'an actor to provide complete and

non-misleading information with respect to the subjects *on which he undertakes to speak.*'" (quoting *Helwig*, 251 F.3d at 561) (emphasis added by Eighth Circuit).[19]

Firestone also argues that the August 1, 2000 statement is non-actionable because it was "immaterial as a matter of law." Appellee Firestone's Br. at 40. Echoing the district court, Firestone argues that the statement was one of "'of general optimism and in its defense of its products,'" *id.* (quoting App. at 1018), and one that "reflect[ed] the market's understanding that others had suggested the products were not as safe as Firestone believed." Appellee Firestone's Br. at 47. As such, Firestone argues, the statement does "'not come within the duty of disclosure,'" *id.* at 44 (quoting *Sofamor Danek*, 123 F.3d at 402), because such opinions are "'routinely discounted by reasonable investors," *id.*

We reject this argument also, for several reasons. First, we do not agree that the statement that "the objective data clearly reinforces our belief that these are high-quality, safe tires" was a statement of general optimism or purely opinion. Rather, the statement was an assertion of a relationship between data and a conclusion, one that a finder of fact could test against record evidence.

Second, even if the statement regarding "objective data" was best classified as an opinion, it was still specific enough to form the basis of an actionable securities fraud claim. Federal courts have drawn the line on whether a statement may be actionable based, not on whether in the abstract a statement was best characterized as fact or opinion but, rather, if it was an opinion, on the nature of the statement. The key is whether the proposition at issue can be proven or disproven using standard tools of evidence. Thus, as alluded to above, vague statements not subject to verification by proof are generally deemed non-actionable puffery. But "opinion or puffery . . . in particular contexts when it is both *factual and material . . . may* be actionable." *Longman*, 197 F.3d at 683 (emphasis added).

For example, in *Virginia Bankshares*, the Supreme Court held that an opinion expressed by a corporation's board members to its minority stockholders that the stock price of $42.00 for the purchase of the company's shares was a "high value" and represented a "fair" transaction could be both factual and material. 501 U.S. at 1093. In so holding, the Court expressly rejected the petitioner's argument, similar to that offered by Firestone here, that the Court "would invite . . . amorphous issues outside the readily provable realm of fact if [it] were to recognize liability . . . on proof that the directors did not recommend the merger for the stated reason." *Id.* at 1091. "It is no answer to argue," the Court stated, "that the quoted statement on which liability was predicated did not express a reason in dollars and cents, but focused instead on the 'indefinite and unverifiable' term, 'high' value, much like the similar claim that the merger's terms were 'fair' to shareholders." *Id.* at 1093. "The objection ignores the fact," observed the Court, "that such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* Rather, "[p]rovable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more

---

[19]Contrary to Bridgestone and Firestone's assertions, such a conclusion is consistent, or not inconsistent, with this court's decision in *Sofamor Danek*, 123 F.3d at 401-02. In that case, the defendant corporation was silent as to the alleged product defects and likely regulatory problems and this court held there was no actionable omission. In contrast, Firestone (and Bridgestone) chose to speak, implicating, through that choice, the duty to speak truthfully as to the topics on which it spoke.

definite statements, and defended or attacked through the orthodox evidentiary process that either substantiates their underlying justifications or tends to disprove their existence." *Id.*[20]

This court's en banc decision in *Helwig* also reflected these insights. In that case, the defendant corporation stated that it was "comfortable" with favorable earnings per shares estimates made before the passage of a piece of legislation even though in secret, internal communications, the corporation was making negative predictions about the impact of the statute on earnings. *Helwig* recognized that such opinions about a verifiable assertion "contain 'at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement.'" *Helwig*, 251 F.3d at 557 (quoting *Schneider v. Vennard (In re Apple Computer Sec. Litig.)*, 886 F.2d 1109, 1113 (9th Cir. 1989)). Reversing the district court's dismissal of the securities fraud claim, *Helwig* noted that unlike the facts underlying this court's decisions in "*Sofamor Danek*, [in which] the information claimed as adverse to the company had already been disclosed and was publicly available to permit an independent assessment by investors and analysts," or "*Starkman*, [which] was a case about non-disclosure," *id.*, the complaint in *Helwig* "[wa]s about *selective* disclosure of information . . . essential to complete a picture [the defendants] had only partially revealed." *Helwig*, 251 F.3d at 560 (emphasis added). "[T]he protections for soft information," *Helwig* stated, "end where speech begins." *Id.*

As in *Helwig*, the Retirement Fund's Complaint pleads a theory of liability for selective, incomplete disclosure. Following *Helwig*, we conclude that a reasonable juror in this case could conclude that Firestone's statement that "the objective data clearly reinforces our belief that these are high-quality, safe tires" carried with it the representation that there was a reasonable basis for that belief, and that Firestone was not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement, and that both those representations were misleading. That juror could thus find that the statement concerning objective data was actionable. *Accord Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (holding that a company's statements regarding the safety of its new products were actionable where the reassuring statements "were designed to prevent shareholder flight in the aftermath of a damaging report regarding the possible hazards of [the product]").

Finally, as to Firestone's contention that the statement about the "objective data" is non-actionable because it "reflect[ed] the market's understanding that others had suggested the products were not as safe as Firestone believed," Appellee Firestone's Br. at 47, this argument mischaracterizes the facts as pled in the Complaint. A number of courts have indeed suggested that misrepresentations about a fact already known to the marketplace are not actionable.[21] And, although this Court has not directly addressed this theory, it voiced the logical complement in *Helwig*, which, in reaching its conclusion that the statement at issue was material, relied in part on the fact that the information at issue was "known *exclusively*" to the defendants. 251 F.3d at 560 (emphasis added). It makes logical sense that a claim based on the alleged withholding from the

---

[20] This court has recognized that "*Virginia Bankshares* is instructive for" materiality analysis in § 10(b) cases because although the Court in *Virginia Bankshares* was concerned with § 14(a), not § 10(b) of the Securities Exchange Act, "the [SEC] has promulgated the same rule for each section: violations occur under each section whenever a statement is false or a material omission makes the statements which are made misleading." *Mayer v. Mylod*, 988 F.2d 635, 639 n.2 (6th Cir. 1993) (citing 17 C.F.R. §§ 240.10b-5 and 240.14a-9 (1991)).

[21] *See*, *e.g.*, *Longman*, 197 F.3d at 684 ("Plaintiffs' securities fraud claim cannot succeed because, despite the fact that Food Lion denied the charges, the nature of the off-the-clock claims and the claims' risk to earnings were in fact well known to the market before the Prime Time Live broadcast, and therefore Food Lion's omissions were not material."); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) ("We conclude that in a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources.").

public of information that contradicts information publicly stated is defeated by a demonstration that the allegedly withheld information was in fact disclosed to the public; however, that rule is not apposite here. Contrary to the implications of Firestone's argument, that "others" had "suggested the products were not as safe as Firestone believed" does not demonstrate that the market had received the adverse information-- about the tires' test data, the claims for liability based on tire failure, and the deaths in the United States and abroad--that form the basis of the information the Retirement Fund alleges was withheld from the public. Rather, in an open and efficient securities market "information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1425 (internal citation omitted). And, indeed, not until after Firestone's August 9, 2000 recall did the share value for both the Bridgestone common stock and Bridgestone ADRs each plummet by over one third of their value in approximately six weeks: between August 8, the day before the recall, and September 21, 2000, Bridgestone's common stock share price on the Tokyo stock exchange dropped from over $2,200.00 to less than $1,400.00, and its ADR share price from over $202.00 to less than $122.00. Accordingly, a reasonable juror could conclude that the revelations that accompanied the announcement of the August 2000 recall were in part reflected in this substantial share price change, which would suggest strongly that the market had not--prior to the public disclosures encapsulated in the recall--received the full extent of information related to the safety-related problems associated with Firestone's tires, and that such information was quite important to investors.

For the foregoing reasons, we hold that while most of the statements alleged by the Retirement Fund were insufficiently specific to be actionable, the August 1, 2001 statement regarding "objective data" is actionable. We turn now to Bridgestone's alleged misrepresentations in the Annual Reports' financial statements.

### b.       Financial Statements in Bridgestone's Annual Reports

The district court held that none of the claims based on financial statements in Bridgestone's Annual Reports for fiscal years 1996 through 1999 were actionable. The district court reasoned that the Complaint "failed to plead a single fact that would have caused a reasonable investor to believe that Bridgestone's financial statements were prepared according to United States GAAP, or that a reasonable investor would have relied on this belief," failed to "plead any particular fact that could establish any inference that Bridgestone violated Japanese GAAP," and that "even if Bridgestone was subject to United States GAAP," the Complaint "failed to plead with particularity any facts establishing a strong inference that Bridgestone should have 'considered probable' a Firestone recall and thus established a huge contingent liabilities fund." App. at 1016 (quoting FASB 5). Bridgestone argues that we should affirm on essentially the district court's rationales. As discussed below, we disagree with that conclusion with respect to the statement in Bridgestone's 1999 Annual Report, but agree with the result reached by the district court concerning the claims based on the financial statements in Bridgestone's 1996-1998 Annual Reports.

### i.       Bridgestone's 1999 Annual Report

Issued in March 2000, Bridgestone's 1999 Annual Report included at least two representations that a reasonable juror might conclude were material misrepresentations: (1) that no impairment of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions (the "No Impairment" representation); and (2) that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires (the "No Loss" representation).

### (a)      The "No Impairment" Representation

The 1999 Annual Report included several groups of statements that, taken together, constituted a representation to the investing public that no impairment of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions. The below comparison of the Annual Report's accounting policy statements, the actual disclosures under those statements, and the alleged "on the ground" facts at Bridgestone and Firestone, reveals why a reasonable juror could conclude that this statement was a misrepresentation.

The accounting policy statements communicated to the investing public that if a loss or asset impairment was probable, the Annual Report would disclose that contingency in some form. The 1999 Report included a letter from Bridgestone's outside auditors stating that it was prepared "in conformity with accounting principles generally accepted in Japan applied on a consistent basis." Under International Accounting Standard § 9010.08-.09, applicable in Japan pursuant to the International Accounting Standards Committee, "loss contingencies should be recorded if it is probable that an asset has been impaired or a liability incurred at the balance sheet date and a reasonable estimate of the amount of the resulting loss can be made." Section 9010.08-09 provides further that "if either of the conditions is met and the possibility of the loss is not remote, the existence of the contingent loss should be disclosed in the financial statements." The 1999 Report also stated that "the Japanese consolidated financial statements have been prepared in accordance with the provisions set forth in the . . . accounting principles and practices generally accepted in Japan ('Japanese GAAP')." It further represented that Bridgestone's "accompanying financial statements include the accounts of certain foreign subsidiaries, which are based upon U.S. GAAP," a reference to Firestone, its largest foreign subsidiary. We thus disagree with the district court's observation that no investor could have reasonably concluded that a representation was being made under United States GAAP.

United States GAAP, via FASB 5,[22] "requires that loss be accrued whenever it is probable a loss has been incurred or an asset impaired and the amount of the loss can be reasonably estimated. If the loss is at least reasonably possible, but no reasonable estimate can be made, the contingency at a minimum should be disclosed." The unmistakable representation, under both the Japanese and American GAAP policies,[23] was that if a loss or asset impairment was probable, the Annual Report reader would see a discussion of it in some form in the report. A fortiori then, the Report included the representation that if there were a substantial certainty of such an impairment, that contingency or risk would be disclosed. *Cf. United States v. Lamartina*, 584 F.2d 764, 766 (6th Cir. 1978) (embracing this greater-includes-the-lesser logic in the criminal context and noting that "a defendant may be found guilty of an offense necessarily included in the offense charged.").

The disclosures under the Annual Report's stated policies included no reference to the impairment or likelihood of impairment to the asset of the Firestone Brand. The notes to the Consolidated Financial Statements did include a category labeled "Contingent Liabilities," which disclosed deferred income tax assets, deferred tax liabilities, discounted export bills, and lease commitments, note regarding "Market Value Information," which provided a disclaimer that

---

[22]In the United States, GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the 'FASB')." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000). "The SEC treats the FASB's standards as authoritative." *Id.*

[23]The policies articulated in FASB 5 and § 910.08-09 are very similar if not identical in substance. The absence on Note 11's list of differences between U.S. and Japanese GAAP of any reference to the two provisions reinforces that notion.

Bridgestone was "exposed to the currency fluctuation risks in relation" to certain "forward contracts and to the interest rate fluctuation in relation to interest rate swaps," as well as statements cautioning that "those derivatives do not exceed corresponding financial instruments," and that Bridgestone "believes that the risk that the counterparts will not be able to fully satisfy their obligations under contracts is minimum." However, neither the Contingent Liability section nor the Market Value Information section, nor any other portion of the 1999 Annual Report, disclosed the contingency of any loss or asset impairment related to any of the Firestone tire products due to the lawsuits, regulatory scrutiny, or safety-related reasons. Nor did they disclose the potential risk of such an event.

The 1999 Annual Report's simultaneous inclusion of the accounting policies, the listed contingencies, and the absence of any mention of a contingency concerning Firestone tires constituted a representation that no loss or asset impairment arising from Firestone tire products due to the lawsuits, regulatory scrutiny, or safety-related reasons was "probable" or "reasonably possible." The question then is whether a reasonable juror could find that the facts belied that representation.

Bridgestone suggests that it is only in hindsight evident that there was a probability or reasonable possibility of a substantially adverse event as of March 2000. We disagree. By March 2000, Bridgestone and Firestone, according to the allegations of the Complaint, had received thousands of claims for and complaints concerning ATX tire failures, covering hundreds of serious injuries and 174 fatalities by 2000 allegedly resulting from problems with the tires. Firestone had paid off State Farm for the costs of automobile accidents attributable to ATX tire failures. The investigations and scrutiny by the Arizona and Venezuelan governments reinforces the impression that evidence was present of serious risks of adverse consequences for the ATX brand. From 1998 to 1999, tread separations for one ATX model increased by 194%. In 1997 and 1998, another of Firestone's ATX model's tires accounted for the majority of the company's claims but during those same years, that model accounted for less than 10% of Firestone's total production. These claims, suits and payments were discussed at least quarterly from 1997 to 1999 in meetings that consisted of Firestone's senior management group, including Bridgestone Executive Vice-president Ono, and Firestone's financial group, quality group, and public relations / marketing department. A major decision such as a recall by a Fortune 500 corporation is unlikely to simply materialize out of the blue. As the Complaint alleges, the various increasing problems at Firestone crescendoed in 1998 and 1999. From the facts pleaded, assumed to be true, and construing the complaint in the light most favorable to the plaintiffs, it was, under all these circumstances, at least "reasonably possible" if not "probable" that, as of March 2000, the Firestone flagship brand ATX tires would experience a serious, adverse, financial event--an impairment of the asset. Bridgestone's effective representation that no loss or asset impairment arising from Firestone tire products due to the lawsuits, regulatory scrutiny, or safety-related reasons was "probable" or "reasonably possible" could thus be deemed by a reasonable juror to have been a misrepresentation based on the facts available at that time.

The question, then, is whether the "No Impairment" representation was material. Put another way, was it "'*so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance?*'" *Helwig*, 251 F.3d at 563 (quoting *Ganino*, 228 F.3d at 162) (emphasis added by *Helwig*). We conclude that it was not. The 1999 Annual Report included at least six statements that stressed to shareholders or potential shareholders the significance of the Firestone brand or the American and North American market, of which Firestone was Bridgestone's major brand: (1) "We are determined to assert a singular advantage in product technology. . . . We increased our market share in North America in 1999 in . . . the original equipment market. Our North American operations are approaching a market share of 20%."; (2) a representation that as a percentage of Bridgestone's net sales, its sales in the Americas were 41.5 %, the largest of any geographic sector; (3) "[w]e increased our market share in North America in 1999 . . . Demand for original equipment tires continued to grow in 1999 in the booming North

American automobile market"; (4) a statement under the bold, purple-colored, large font label of "Trends And Topics" that "[o]ur multibrand strategy--centered on . . . Firestone . . . raised our market profile further in 1999;" (5) "aggressive product development and strategic marketing have re-established the Firestone name as a vigorous brand in premium-grade tires, as well as in large-volume, middle-market tires;" and that (6) "[a]s a major supplier to leading European automakers, we have developed business with the North American operations of those automakers, too. We also supply tires to nearly all the Japanese-owned vehicle plants in North America." Firestone's financial and brand name health was of obvious importance to the overall state of Bridgestone's financial health. That relationship was evident both from its portrayal in the Annual Reports and in the severely adverse results that resulted immediately after the asset impairment occurred: in addition to the stock and ADR share price drops, recall that Firestone and Bridgestone each experienced a net $510 million loss for the 2000 fiscal year and that Bridgeport's net earnings in 2000 were 80% less than in fiscal year 1999. We conclude--at a minimum--that the probability or reasonably possibility of Firestone's brand name experiencing a significant asset impairment was not information "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance." *Id.* (internal quotations omitted and emphasis omitted) This information was therefore not "immaterial" within the meaning of the federal securities laws. 15 U.S.C. § 78u-5(c)(1)(A)(ii). A reasonable juror could conclude that Bridgestone's "no impairment" representation in the 1999 Annual Report was actionable.

### (b)          The "No Loss" Representation

The second representation from Bridgestone's 1999 Annual Report that a reasonable jury could conclude was actionable was its effective representation that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires. FASB 5 "requires accrual by a charge to income (and disclosure) for an estimated loss from a loss contingency if two conditions are met: (a) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements, and (b) the amount of loss can be reasonably estimated." The Retirement Fund asserts that both FASB 5 and its Japanese analogue gave rise to a duty to disclose because Bridgestone "had specific knowledge throughout the Class Period that [it was] already incurring substantial loses through the replacement of tires, settlements of lawsuits and payment of claims." Appellant's Br. at 47.

Bridgestone responds on this point with two arguments. First, it argues that the Complaint's claims based on problems related to the tires' safety record are an impermissible attempt to plead fraud by hindsight. Bridgestone asserts that "the Retirement Fund has simply seized upon disclosures made in later annual reports and alleged that they should have been in earlier ones." Appellees Bridgestone and Kaizaki's Br. at 30 (internal quotations omitted). This is literally true but does not mean that the Complaint advances an impermissible theory of liability: the losses already sustained as of March 2000 were clearly facts reasonably (and actually) available to Bridgestone in an amount calculable with precision or near-precision as of March 2000; if they were material and subject to disclosure under the stated accounting policies, it is no answer to say they were eventually disclosed later in time.

Bridgestone's second and more forceful argument is that these losses were not material. Bridgestone asserts that "the complaint contains no pleaded fact indicating Bridgestone knew about any substantial losses or that those amounts . . . actually were substantial for an $18 billion company." Appellees Bridgestone and Kaizaki's Br. at 29 (internal quotations omitted). "Indeed," Bridgestone argues, "every manufacturer replaces its products, settles lawsuits, and pays claims as part of its day-to-day business; yet, no one would contend these activities alone requir[e] reserves." *Id.*

This argument is ultimately unpersuasive for three reasons. First, assuming the truth of the facts set forth in the Complaint, by March 2000--when the Bridgestone 1999 annual Report was issued--over 2000 rollover accidents, 700 serious injuries and 170 fatalities had occurred yielding thousands of claims for and complaints concerning ATX tire failures and Bridgestone (via Firestone) incurred numerous categories of financial losses, including those affiliated with entering into numerous settlement agreements with the injured parties involving compensation, reimbursing State Farm, absorbing the cost of replacing the tires in Arizona, and absorbing the cost of adding a nylon layer to its tires in Venezuela. A reasonable juror could infer from this category-based evidence (as opposed to dollar-amount-based evidence not included in the Complaint) that the related losses were substantial. That the Retirement Fund has not through disclosure at this pre-discovery stage identified the precise amount of the payments as of March 2000, or amounts corresponding to agreements reached by Bridgestone or Firestone by March 2000 for sums not as of then yet paid out, is no bar to the claim. The precise information as to dollar amount is presumably available thus far only to Bridgestone and may well emerge in discovery. It is enough at this motion to dismiss stage that the Complaint alleges specific losses via seemingly out of the ordinary payments on this wide array of issues, each of which, as stated, was a definite amount that had already been paid out by the time of the release of the subsequent annual report. *See* FASB 5 (requiring the disclosure of "information available prior to issuance of the financial statements indicat[ing] that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements" the amount of which can "be reasonably estimated").

Second, while it is likely the case that not every settlement or claim requires a reserve, that is besides the point here. These payments were not as a group routine or minor; they covered thousands of claims that alleged a common problem with a major product of Bridgestone's largest subsidiary in its highest volume sales market, the Americas. Because the 1999 Annual Report represented that there were no actual losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires' failures, there was a duty to disclose any material information to the contrary, be it in the form of a reserve, notice of a contingency, or some other form of disclosure.

Third, to the extent the materiality question is close, the general rule for securities fraud cases is that "[a]t [the motion to dismiss] stage in the proceedings, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Helwig*, 251 F.3d at 563 (internal citations, quotations, ellipses and emphasis omitted). Courts "generally reserve such questions for the trier of fact." *Id.* (collecting cases). We think this approach is appropriate here, both because a reasonable juror could find this claim actionable and because we are reversing on independent grounds with respect to a separate statement in the 1999 Annual Report.

### ii.          1996-1998 Annual Reports

With respect to the financial statements for the Annual Reports for fiscal years 1996 to 1998, we conclude that the district court did not err in dismissing the claims based on those statements. Unlike the 1999 Annual Report, these reports contained no representation to the effect that United States GAAP standards applied. Any claim, if at all, based on these Annual Reports would have to be based solely on the implied statement (to American investors at that) that International Accounting Standard § 9010.08-.09 applied. Most significantly, much of the evidence that the Complaint relies on as establishing that the asset was impaired or likely to suffer impairment became fully available after March of 1999, when the last of these three reports was issued, particularly the data summary on the 34 suits against Bridgestone based on deaths or injuries by consumers of Firestone-equipped Ford Explorers from rollovers allegedly caused by Firestone tires, the tread separations increases from 1998 to 1999, and the dramatic rise in problems in 1998 and 1999. The facts tending to undermine the truth of the Annual Reports' representations regarding impairment

and loss were thus not known at all or not known to their full extent as of the dates that the Annual Reports for the 1996--1998 fiscal years were issued.

For the foregoing reasons, we conclude that the Complaint pleaded three actionable claims: (1) Firestone's August 1, 2000 "objective data" representation; (2) Bridgestone's "No Impairment" representation; and (3) Bridgestone's "No Loss" representation.

### 2.          Scienter

Mindful that to survive a motion to dismiss, a federal securities fraud claim must "withstand an exacting statement-by-statement analysis," *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 886 (W.D.N.C. 2001), the question then is whether the Complaint adequately pled scienter for these particular statements as against Bridgestone, Firestone, or Ono. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12. "As with all fraud claims, Federal Rule of Civil Procedure 9(b) applies to pleading a defendant's state of mind, allowing that '[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *PR Diamonds*, 364 F.3d at 682 (quoting Fed. R. Civ. P. 9(b)).

However, in 1995, Congress having "concluded that Rule 9(b) had 'not prevented abuse of the securities laws by private litigants,'"[24] enacted the Private Securities Litigation Reform Act ("Reform Act"). The Reform Act grafted on "special requirements for pleading scienter in federal securities fraud cases." *PR Diamonds*, 364 F.3d at 682. As amended by the Reform Act, the securities laws provide:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state *with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u-4(b)(2) (emphasis added). Under the Reform Act, if a plaintiff does not meet this requirement, the reviewing district court "shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3).[25] In enacting the Reform Act's scienter-related provisions, Congress sought simultaneously to curb frivolous securities fraud litigation, which "'unnecessarily increase[s] the cost of raising capital and chill[s] corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news, not evidence of fraud,'" *Comshare*, 183 F.3d at 548 (quoting S. Rep. No. 104-98 (1995), 1995 U.S.C.C.A.N. 679, 690), and "to protect investors and to maintain confidence in the securities markets." H.R. Conf. Rep. No. 104-369, at 31 (1995), 1995 U.S.C.C.A.N. 730. Reflecting this balance, this court has noted that after the

---

[24] *Comshare*, 183 F.3d at 548 (quoting H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 818).

[25] We take no position as to the constitutionality of the Reform Act's heightened scienter pleading requirements. The Seventh Amendment to the Constitution provides that "the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. Am. VII. Traditionally, there has been a right to jury trial for securities fraud claims. *See, e.g.*, *SEC v. Infinity Group Co.*, 212 F.3d 180, 196 (3d Cir. 2000). The Reform Act compels dismissal unless the facts pleaded in the Complaint produce a "strong inference that the defendant acted" with scienter. 15 U.S.C. § 78u-4(b)(2). One might argue that for cases where a juror could conclude that the facts pleaded showed scienter, but that conclusion would not be the most plausible of competing inferences, a Seventh Amendment Problem is presented. However, the Retirement Fund has not advanced any such argument and we decline to address the merits of this constitutional question sua sponte.

Reform Act, for those complaints advancing non-frivolous, well-pled allegations of scienter, "[o]ur willingness to draw inferences in favor of the plaintiff remains unchanged." *Helwig*, 251 F.3d at 553; *see also id.* (rejecting an interpretation of the Reform Act under which "it [would] become a choke-point for meritorious claims").

In elaborating on the meaning of the statute's term "strong inference," *Helwig* explained that "[i]nferences must be reasonable and strong--but not [necessarily] irrefutable." *Id.* The Complaint "need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder." *Id.* Rather, under the "strong inference" requirement, the Retirement Fund is "entitled only to the most plausible of competing inferences." *Id.* "'Strong inferences' . . . involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact." *Id.* (quoted with approval in *In re Ford*, 381 F.3d at 568). Our task is thus to determine whether the Complaint alleges facts that, if true, would, by forming the basis for a strong inference, "convince a reasonable person that the defendant knew a statement was false or misleading." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003). Ultimately, in our scienter analysis, we "employ[ ] a totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong inference of at least recklessness." *PR Diamonds*, 364 F.3d at 683. "'This necessarily involves a sifting of allegations in the complaint.'" *PR Diamonds*, 364 F.3d at 684 (quoting *Helwig*, 251 F.3d at 551). Towards that end, *Helwig* identified nine factors that, while "not exhaustive," are "helpful" in determining whether the facts as pled are "probative" of scienter in securities fraud actions:

(1)     insider trading at a suspicious time or in an unusual amount;

(2)     divergence between internal reports and external statements on the same subject;

(3)     closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4)     evidence of bribery by a top company official;

(5)     existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6)     disregard of the most current factual information before making statements;

(7)     disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8)     the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9)     the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)) (in turn, collecting cases). With these standards in mind,[26] we turn to analyze scienter as to each of the three

---

[26]We note that, contrary to Bridgestone's and Firestone's arguments, which rely heavily on *In re Carter-Wallace Inc. Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000), and *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000), the precedent of this circuit frames our scienter inquiry in this claim for securities fraud based on partial or incomplete disclosure.

relevant defendants, the two corporate legal persons--Firestone and Bridgestone--and the one individual, Firestone CEO and Bridgestone Executive Vice-President Ono. *Id.*

### a.      Scienter as to Firestone

On August 1, 2000, Firestone released its statement that "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires." With respect to Firestone's scienter concerning this statement, at least five of the nine non-exclusive *Helwig* factors are apparent in the Complaint's alleged facts. First, there was a clear "divergence between internal reports and external statements on the same subject," *Helwig*, 251 F.3d at 552; witness the contrast between the data known or available to Firestone as of August 2000--concerning the evidence of defective tires from Decatur and three years of a marked rise in the rates of deaths, injuries and claims and lawsuits based on several thousand rollover accidents, hundreds of injuries, and nearly 200 fatalities in the United States, over forty deaths in Venezuela, the multiple deaths in Saudi Arabia--versus the unqualified positive comments on the "objective data." Firestone's awareness of the circumstances at the Decatur plant, including in particular the strike, the untrained replacement workers, the production schedule time increase imposed by Bridgestone and Firestone in the labor negotiations with the union, and the test results pointing to higher rates of problems in the Decatur-produced ATX tires, make the imputation of scienter reasonable.[27]

Other factors reinforce this conclusion. There was a "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," *id.*; the August 1 statement about "objective data" was followed one week later by the recall of 6.5 million tires and four months later by the admission that many of the tires from the Decatur plant were made with a shoulder pocket more likely to crack than normal due to an improper angle and were more likely to fail to stick together properly. There was also a "disregard," or at least a seeming disregard, of "the most current factual information before making statements." *Id.* Further, to the extent Firestone disclosed its data to Bridgestone in a form substantially similar to that presented in Bridgestone's Annual Reports, Firestone's "disclosure of accounting information [was made] in such a way that its negative implications could only be understood by someone with a high degree of sophistication." *Id.* Finally, assuming, as the Complaint alleges, that Bridgestone executives "kept the accident rate data which they had and which showed these serious problems from safety regulators . . . so they could report huge profits and their executives could retain their positions of power, prestige and profit and Bridgestone's stock and ADRs would continue to trade at inflated, higher prices, providing the executives with direct economic benefits based on their stock holdings and options and allowing them to personally pocket huge bonuses based on corporate profits," there was thus a "self-interested motivation of defendants in the form of saving their salaries or jobs." *Helwig*, 251 F.3d at 552.[28]

Three of the nine *Helwig* factors are clearly absent as pertains to Firestone, although in a sense these factors all go to the same question: conflict of interest. That is, there is no evidence of alleged insider trading at a suspicious time or in an unusual amount, no evidence of bribery by a top

---

[27] Arguably, the known background of the 1979 recall based on a faulty adhesion compound discovered after Firestone's public disavowals of such a problem and the strikingly similar pattern to the problems identified in Firestone's 2000 investigative report makes it that much more reasonable to impute scienter to Firestone.

[28] We reject Firestone's suggestion that the withholding of information by senior corporate executives to effectuate an inflation of the executives' bonuses, stock prices, and job security is an "ordinary corporate event." Appellee Firestone's Br. at 45. Even if a regular occurrence, it is not an event this court sanctions as being legitimately ordinary.

company official, and no evidence of personal interest of certain directors in not informing disinterested directors of an impending sale of stock.

That covers eight of the nine *Helwig* factors. A word is in order on whether the remaining factor is present, i.e. whether there is the "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit." *Id.* There is not, strictly speaking, such evidence because the claims in question were not based on fraud per se. However, the presence of closely related evidence carries some weight, particularly given that the list of factors is "non-exhaustive." *Id.* Firestone entered into multiple settlement agreements in response to product liability suits under which the settlement agreements with plaintiffs were sealed, the parties entered into stipulated protective orders to conceal discovery, and Firestone would have returned to it "damaging documents." The gravamen of these claims and lawsuits, though framed as pre-litigation claims or lawsuits in tort, was closely parallel to that of this suit: the tires were not safe and Firestone should be held accountable for that fact. Moreover, Firestone secretly settled with State Farm all claims for insurance in exchange for lack of disclosure by State Farm and avoided through a secrecy agreement with the Venezuelan government any disclosure of its having added nylon layers to ATX tires in Venezuela. The evidence of these secret settlements gets at the same notion as does the *Helwig* factor instructing courts to analyze whether there have been ancillary lawsuits filed charging fraud followed by quick settlement of such suits. The apparent animating idea is that a company engaging in such practices is, all things being equal, more likely than not aware of the improper nature of the practice being alleged, or at least of the perception of the given problem, which puts it on notice and, is fair to say, generates a duty to inquire. These settlements are thus appropriate to weigh in our scienter analysis, since "this court has made clear that 'the label which a plaintiff applies to a pleading does not determine the nature of the cause of action which he states.'" *Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2001) (quoting *United States v. Louisville & Nashville R. Co.*, 221 F.2d 698, 701 (6th Cir. 1955)). Thus, in substance, if not form, we think a sixth of the nine factors is also present.

Given all this, we conclude under the totality of the circumstances that "the facts argued collectively . . . give rise to a strong inference of at least recklessness." *PR Diamonds*, 364 F.3d at 683. The Retirement Fund has therefore adequately pleaded scienter with respect to its claim against Firestone for the Firestone's August 1, 2000 statement.[29]

### b.      Scienter as to Bridgestone

We next analyze whether the Complaint adequately pled scienter against Bridgestone for the two actionable representations in the 1999 Annual Report discussed above in Part II(C)(i)(a): (1) the "No Impairment" representation--that no impairment of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions and

---

[29]We do not foreclose the possibility that, going forward, Firestone may be held liable for Bridgestone's misrepresentations to the extent the Retirement Fund can prove Firestone communicated misleading results to Bridgestone. The requirement that the plaintiff allege that the defendant made a misrepresentation does not mean that the plaintiff must allege that the defendant communicated that misrepresentation directly to the plaintiff. *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 407 (S.D.N.Y.1998); *see, e.g., Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997) (defendant "'cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties'") (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) ("There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach."). If the Retirement Fund can show that Firestone was the originator of Bridgestone's misrepresentations regarding Firestone and that Firestone knew or should have known that its misrepresentation would be communicated to investors, primary liability should attach. *See Anixter*, 77 F.3d at 1226. We need not assess here the factual question of whether Firestone was the original of Bridgestone's misrepresentations regarding Firestone and that Firestone knew or should have known that the misrepresentation would be communicated to investors.

(2) the "No Loss" representation--that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires. A brief word is in order, though, on the nature of these claims. Contrary to Bridgestone's characterizations, the Retirement Fund's theory is not that the Complaint relies on the violation of GAAP to prove scienter. As Bridgestone correctly points, that allegation, without more, would not be sufficient to plead scienter adequately. *See*, *e.g.*, *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 432 (6th Cir. 1980) (concluding that although "there is sufficient evidence to support the Court's finding that [the defendant] inadequately tested . . . financial figures in certain respects, [ ] the evidence falls far short of proving that [the defendant] intended to deceive the stockholders."). Rather, GAAP is only part of the Complaint's explanation of the falsity of the claim: as discussed below, the Complaint alleges a wide range of facts above and beyond the violation of GAAP on which a reasonable juror could conclude scienter was proven. That brief detour aside, we turn to the two statements.

### i.          Bridgestone's Scienter as to Its "No Impairment" Representation

As to Bridgestone's scienter with respect to the "No Impairment" representation, we conclude that "the most plausible of competing inferences" arising from the evidence is that Bridgestone was at least reckless as to the falsity of that representation. *Helwig*, 251 F.3d at 553. The analysis on this claim breaks down similarly to that for Firestone: four--arguably five-- of the *Helwig* factors are present.

First, and in this case most significantly, the Complaint pleads facts that, if proven, could show a divergence between internal reports and external statements on the same subject. By the end of 1999, consumers had filed fifty lawsuits based on alleged problems with the ATX tires against Bridgestone or Firestone or both, thirty-four of them filed between 1997 and 1999. As former Firestone Vice-President of Quality Assurance Robert Martin testified in his deposition, Ono, who was Bridgestone's Executive Vice-President in addition to his role as Firestone CEO, was a member of the working group that from 1997 to 1999 tracked the lawsuits' status. An 1999 internal Firestone document included data that one of the ATX tire models--the ATX II--was the basis of the majority of the claims against Firestone but only ten percent of its production. A reasonable juror could conclude that this was a red flag as to problems with the tire model. Similarly, the ATX Wilderness model experienced in 1999 a rise in claims for tire tread separations of 194% over the previous year, another potential red flag. Thus, the facts known or available to Bridgestone were seemingly in tension with the representation that no impairment risk of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions and that there was no contingency risk of such a loss. Consider also Firestone's previous tire tread problems, fine, and massive recall, with which it is reasonable to assume, given due diligence standards, that Bridgestone, as its suitor in a multi-billion dollar purchase the previous decade, was aware. This history was in the known corporate background and should have made Bridgestone more attuned to the likelihood, or at least non-trivial, contingent possibility, of a major financial hit to Firestone as the lawsuits, settlements, and regulatory and public scrutiny surrounding the Firestone ATX tires, as used on the Explorer, intensified from 1996 to 1999. This is particularly so given that the Americas were Bridgestone's largest sales market, that the North American market was, according to Bridgestone's Annual Reports, a major source of past and presumed future growth, that Firestone was the primary engine fueling that growth, and that the Explorer contract in particular was – by all appearances – a key to Firestone's return to profitability.

Three, arguably four, other factors are further probative of Bridgestone's scienter, albeit with less force than the first one. First, for the reasons just outlined, we conclude that the facts could show that Bridgestone disregarded "the most current factual information before making statements." *Helwig*, 251 F.3d at 552. Second, the 1999 Annual Report, by combining its statement of accounting policy with its silence, can be viewed as "disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of

sophistication." *Id.* Third, for the reasons discussed above with respect to Firestone, the evidence supports a finding of "self-interested motivation of defendants in the form of saving their salaries or jobs." *Id.* Fourth, for the reasons discussed in the context of Firestone but also applicable to Bridgestone, the existence of ancillary claims by consumers and State Farm Insurance, lawsuits, and settlements based on claims alleging harm from unsafe ATX tires, and Firestone's quick and secret settlements of such claims, arguably is also probative of Bridgestone's recklessness as to the truth of its "No Impairment" representation.

The four other *Helwig* factors admittedly are not probative of scienter. As to the "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," Bridgestone's statement in March 2000 occurred over four months before the information accompanying the safety recall was disclosed, too distant in time to draw an adverse inference. And, as discussed in the Firestone context, the Complaint does not allege insider trading at a suspicious time or in an unusual amount, evidence of bribery by a top company official, or the personal interest of certain directors in not informing disinterested directors of an impending sale of stock.

Nonetheless, considering the totality of the circumstances, in particular the divergence of internal and external statements with respect to clearly material information going to one of Bridgestone's major flagship brands, "the facts argued collectively . . . give rise to a strong inference of at least recklessness" as to the truth of its "No Impairment" representation. *PR Diamonds*, 364 F.3d at 691.[30] The Retirement Fund has therefore adequately pleaded scienter with respect to its claim against Bridgestone for that representation.

###           ii.           Bridgestone's Scienter as to Its "No Loss" Representation

We turn now to analyze whether the facts as pleaded give rise to a strong inference of recklessness by Bridgestone as to its representation in the 1999 Annual Report that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires. Again, we think the key factor here is the "divergence between internal reports and external statements on the same subject." *Helwig*, 251 F.3d at 552. As discussed, Ono, Bridgestone's Executive Vice-President, met at least quarterly with Firestone's senior management group from 1997 to 1999, the financial group, the quality group, and the public relations / marketing department and in those meetings discussed the tread-peeling claims lodged against Bridgestone (as well as against Firestone). Assuming the truth of the Complaint's allegations, these discussions addressed the lawsuits, claim settlements, and informal complaints that led to investigations by governmental authorities in Arizona, Venezuela, and Saudi Arabia, as well as the secret settlements with State Farm under which Firestone reimbursed State Farm for accidents allegedly caused by ATX tire failures. Ono's awareness of the claims as gleaned from these meetings is directly attributable to Bridgestone[31] because "knowledge of a corporate officer or agent acting within the scope of [his] authority is attributable to the corporation." 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.8[4], at 444 (4th ed. 2002); *cf. Adams v. Kinder-Morgan*, 340 F.3d at 1106 ("[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.").

---

[30] *Cf. In re Ford*, 381 F.3d at 572 (noting, in affirming the dismissal of securities fraud claims against Ford arising out of facts common to this case, that "it would be reasonable to expect the cost of replacing any tires would be on Bridgestone").

[31] The Retirement Fund makes no serious argument that Bridgestone can be held liable for Firestone's August 1, 2000 statement; we therefore do not address that argument. We note though that generally a subsidiary's fraud cannot be automatically imputed to its corporate parent. *See In re Comshare*, 183 F.3d at 554.

Two facts reinforce the notion that Bridgestone knew or should have known that it was taking heavy losses via claims settlement resulting from alleged problems with the ATX tires. First, Bridgestone should have been particularly attuned to the possibility of defect-caused problems from ATX tires manufactured at the Decatur plant in light of its awareness of the strike and the round-the-clock production schedule and the "implemented adjustments in working hours that permit our plants to operate 24 hours a day, seven days a week" that Bridgestone's 1996 Annual Report trumpeted, showing that it was clearly aware of the situation. Second, a 1999 internal Firestone report shows that the ATX II model was accounting for a quite disproportionate percentage of claims alleging tire failure relative to its production quantity as a Firestone's total tire output: over 50% versus 10%.

There is, as with the other two actionable statements and for the reasons previously stated, evidence of the existence of ancillary lawsuits and Firestone's quick settlement of those suits, of disregard of the most current factual information before making statements, of disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication, and of the self-interested motivation of defendants in the form of saving their salaries or jobs. Also like the analysis of the "No Impairment" representation, there is a lack of probative evidence as to the remaining *Helwig* factors.

Again, given this totality of circumstances, "the facts argued collectively . . . give rise to a strong inference of at least recklessness" by Bridgestone as to the truth of its "no loss" representation. *PR Diamonds*, 364 F.3d at 683. The Retirement Fund has therefore also adequately pled scienter with respect to its claim against Bridgestone for this representation.

### c.　　Scienter as to Ono

The Complaint attributes to Ono, as an individual corporate officer of Firestone and Bridgestone, all of the alleged misrepresentations of those two corporate defendants. The Retirement Fund seeks to attach liability to Ono based on his status as Firestone CEO and Bridgestone Executive Vice-President when those two companies issued the alleged misrepresentations. The Retirement Fund argues that "Ono is Liable for Firestone's and Bridgestone's statements under the group-published doctrine and inference," also known as the "group-pleading" doctrine. Appellant's Br. at 48. The district court dismissed the claim against Ono for failure to plead scienter. Albeit for different reasons, we agree that the claim against Ono should have been dismissed.

At least two circuits have specifically recognized a "group pleading" exception to the pleading-with-particularity requirements of Federal Rule Civil Procedure 9(b). *See Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987); *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997). That exception is premised on the assumption that "[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Wool*, 818 F.2d at 1440.

Firestone argues that this doctrine runs afoul of the amended pleading requirements embodied in the Reform Act, which requires, for adequate pleading of scienter, that a federal securities fraud complaint state the relevant facts "with particularity." 15 U.S.C. § 78u-4(b). The United States Court of Appeals for the Fifth Circuit and a number of district courts have held that the group-pleading doctrine is foreclosed by the Reform Act.[32] Generally without discussion of the effect of the Reform Act, the several circuits that embraced the group-pleading doctrine prior to the

---

[32]*See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364 (5th Cir. 2004) (collecting cases).

passage of the Reform Act have continued to apply that doctrine since the Reform Act's enactment. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-63 (9th Cir. 2000); *Schwartz*, 124 F.3d at 1254. This court has not taken a position on whether such an exception exists. Courts are divided on this issue.[33]

We need not decide here the current viability of the group-published doctrine because resolution of that question is not required to decide this case. The Complaint pleads, regarding Ono, little more than his corporate titles, dates of employment and resignation, and attendance at the quarterly meetings. The Retirement Fund does not allege by direct allegation or even upon information and belief that Ono played any role in drafting, reviewing, or approving the Firestone's "objective data" representation or the Bridgestone annual reports, 1999 or any other years. Nor does it allege that he was, as a matter of practice, or by job description, typically involved in the creation of such documents. Even if we permit the group-pleading inference, these alleged facts, without more, are not enough to attribute the alleged misstatements to Ono. *See*, *e.g.*, *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 946-47 (N.D. Ill. 2003) ( "Even if the group pleading doctrine survives the [Reform Act], . . . . [a] plaintiff is . . . required at least to include allegations . . . relating to an individual defendant's duties . . . that create a presumption that the company's statement was somehow . . . attributable to an individual defendant. Simply alleging an individual defendant's title is not enough."); *In re Baan Co.*, 103 F. Supp. 2d at 18 (noting that to satisfy the group-pleading doctrine, a complaint "must identify the roles of the individual defendants, and describe their involvement, if any, in preparing the misleading statements"). Accordingly, we conclude that the district court did not err in dismissing the claims in the Complaint against Ono.[34]

### III. CONCLUSION

To summarize, we hold that: (1) the district court did not err in granting Kaizaki's motion to dismiss for lack of personal jurisdiction; (2) because the Complaint, for Firestone's August 1, 2000 statement that "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires," adequately alleges an actionable statement and scienter against Firestone, the district court erred in dismissing the claim based on that statement; (3) the district court did not err in dismissing the claims against Firestone for its numerous other statements because those statements were not material; (4) the district court erred in dismissing the claims against Bridgestone based on two of its effective representations in the 1999 Annual Report--(i) that no impairment of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions, and (ii) that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires--because for those representations, the Complaint adequately pled an actionable statement and scienter against Bridgestone; (5) the district court did not err in dismissing the claims based on Bridgestone's representations in the financial statements of the 1996-1998 Annual Reports because those statements were not misrepresentations; and (6) the district court did not err in

---

[33] *Compare*, *e.g.*, *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 152-53 (D. Mass. 2001); *In re Baan*, 103 F. Supp. 2d 1, 17 (D.D.C. 2000); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340-41 (S.D. Fla. 1999); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998) (holding that the group pleading doctrine survived the enactment of the Reform Act), *with In re Miller Indus., Inc. Sec. Litig.*, 12 F. Supp. 2d 1323, 1329 (N.D. Ga. 1998); *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1350 (S.D. Cal. 1998) (holding that the Reform Act abolished the group pleading doctrine).

[34] At first glance, it might seem incongruous to reach this conclusion after relying in part on Ono's knowledge of the claims settlements as a basis for Bridgestone's scienter on that claim. However, while an individual officer's knowledge may be attributed to the corporation, liability for the corporation's act does not, absent independent evidence, generally flow from the corporation to the corporate officer.

dismissing the claims against Ono. We therefore need not reach any of the district court's additional rulings.[35]

To withstand the 12(b)(6) motions by Bridgestone and Firestone, the Retirement Fund must for each alleged misrepresentation have adequately alleged five elements: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury. In addition to dismissing the claim against Kaizaki for lack of personal jurisdiction, the district court in its 12(b)(6) analysis held that the Complaint did not satisfy the first three elements as against Bridgestone, Firestone, and Ono, holdings as to which, as just summarized, we reverse with respect to Bridgestone and Firestone and affirm as to Ono. The district court did not address the final two of the five requisite elements: justifiable reliance and proximate cause. The parties' briefs did not address these elements on appeal. As a "'general rule . . . a federal appellate court does not consider an issue not passed upon below.'" *Pinney Dock & Transport Co.*, 838 F.2d 1445, 1461 (6th Cir. 1988) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). We see no special reason to do so here. Consequently, we remand to the district court to consider whether the Complaint adequately pleads justifiable reliance and proximate cause with respect to the three actionable statements as against Bridgestone and Firestone, and for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

[35] In connection with the defendants' motions to dismiss, the district court issued two rulings in addition to those discussed in the opinion, neither of which we need to analyze. First, the district court denied Bridgestone's motion to dismiss for lack of personal jurisdiction. *See* App. at 987-97 (Dist. Ct. Mem.). Because Bridgestone does not cross-appeal, we do not address this aspect of the district court's ruling. *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 35 (D.C. Cir. 1990) (Ginsburg, R.B., J.) (noting that objections to "personal jurisdiction . . . can be waived at any stage of a proceeding and ordinarily are waived by failure to take a cross-appeal") (citing *United States v. American Ry. Express Co.*, 265 U.S. 425, 435-36 n.11 (1924)). Second, although the district court did not enter a Judgment in concert with its September 30, 2002 Order granting the several motions to dismiss, the Retirement Fund treated the district court's dismissal Order as a Judgment and, accordingly, on October 16, 2002, timely filed a motion pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend the Judgment or in the alternative for leave to file a Proposed Amended Consolidated Complaint, which the Retirement Fund attached to its Rule 59(e) motion, along with numerous proposed exhibits. *See* App. at 1039-1319. On February 25, 2003, the district court denied that motion on the grounds of undue delay and futility. *See id.* at 1446-58. Because we have resolved the appeal on the question of whether the district court's initial dismissal was correct, the question of whether the district court also erred in its denial of the motion for leave to amend is moot. We therefore do not address it.